IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

| | | |
|---|---|---|
| GENE R. SMITH and | | |
| CHARLEEN J. SMITH, | : | Case No. 06-10692-TPA |
| Debtors | : | Chapter 12 |
| | | |
| GENE R. SMITH and | : | |
| CHARLEEN J. SMITH, | : | |
| Movants, | : | |
| | : | |
| v | : | Related to Document No. 192 |
| | : | |
| UNITED STATES OF AMERICA, | : | |
| INTERNAL REVENUE SERVICE, | : | |
| PENNSYLVANIA DEPARTMENT | : | |
| OF REVENUE, and RONDA J. | : | |
| WINNECOUR, CHAPTER 12 | : | |
| TRUSTEE, | : | |
| Respondents | : | |

*Appearances:*     Gary V. Skiba, Esq., for the Movants
               Ari David Kunofsky, Esq., for Respondent, Internal Revenue Service
               Jana Pail, Esq., for Respondent, Ronda J. Winnecour

## MEMORANDUM OPINION

Currently before this Court is a ***Motion for Determination of Tax Liability*** ("Tax

Motion"), filed by the Chapter 12 Debtors, Gene and Charleen Smith ("Debtors").  The Debtors seek

a determination that the capital gains tax obligation resulting from the postconfirmation sale of their

farm assets may be  treated as a general unsecured claim.  As authority for their request, the Smiths

reference *11 U.S.C. §1222(a)(2)(A)*.[1]

---

[1]     All references to code sections refer to *Title 11* of the *United States Code* unless otherwise indicated.
The relevant language in *Section 1222* was added in 2005 as part of the *Bankruptcy Abuse Prevention and Consumer
Protection Act of 2005, Pub. L. 109-8, 119 Stat. 23 ("BAPCPA")* amendments to the *Bankruptcy Code*.  *BAPCPA*
became effective on October 17, 2005, and therefore applies to this case.

The Internal Revenue Service ("IRS") objects to this treatment. It argues that *Section 1222(a)(2)(A)* does not apply to taxes that arise from a postpetition and/or a postconfirmation sale of a Chapter 12 debtor's farm assets. The IRS further asserts that the doctrine of sovereign immunity shields it from the Debtors' efforts to have the Court determine the Debtors' capital gains tax liability resulting from the postconfirmation sale of their farm assets.

The Court first finds that the IRS is not shielded by sovereign immunity from the relief sought by the Debtors. Nevertheless, the Court finds in favor of the IRS because the confirmed plan, which was in place before any sale was even contemplated, does not bind the IRS as to a postconfirmation tax obligation and the Debtor may not now modify the plan to change that result. Even if the Debtors were somehow able to overcome that obstacle, the Court finds that Debtors are not entitled to treat a capital gains tax obligation that arises from the Debtors' postconfirmation sale of farm assets as a general unsecured claim. Therefore, the Debtors' *Tax Motion* will be denied.

### FACTS AND PROCEDURAL HISTORY

The Debtors were dairy farmers who conducted their farming operations in Union City, Pennsylvania. On June 20, 2006, they filed their Petition under Chapter 12 of the *Bankruptcy Code*. The Debtors' Amended Chapter 12 Plan (the "Plan") was confirmed on an interim basis on December 19, 2006, and after being further amended to increase the monthly payment, was finally confirmed on November 30, 2007. The Plan called for a continuation of the Debtors' farming operations and provided that "title to the debtors' property shall remain with the debtors." It

2

provided for monthly payments of $3,370 to the Chapter 12 Trustee, funded by proceeds received

from a "milk attachment," i.e., an assignment from a milk producers cooperative.   Unsecured

creditors were to receive no distribution.   There was no provision for a sale of farm assets in the Plan

and the IRS was neither listed as a creditor nor  notified of the Plan

Initially, the Debtors were able to meet their Plan obligations, completing  payment

of $100,873.17 out of a Plan base of $196,918.77.  By late 2008, however, due to what the Debtors

call a "dramatic" decline in milk prices, they were unable to continue making the required Plan

payments.  The Debtors ceased making all Plan payments after February,  2009.  On March 12,

2009, the Debtors proposed a third amended plan ("Proposed 3rd Amended Plan"[2])  under which

their monthly payments would be reduced to $1,050 for a six month period before increasing to

$3,500.    Other than this change in monthly payments,  the Proposed  3rd Amended Plan, was

substantially the same as the Plan, with  funding to come from continuing farm operations and not

a sale of  farm assets.  Both the Plan and the Proposed 3rd Amended Plan  provided that "[t]he title

to the debtors' property shall remain with debtors."

Despite the lower payment provided for in the Proposed 3rd Amended Plan, the

Debtors were still unable to make their payments.  On August 13, 2009, the Debtors filed a *Motion

for Public Sale of Personal Property Free and Divested of Liens* ("Sale Motion") seeking authority

to sell all of their farm equipment and their entire herd of cattle at auction.  Although such a sale was

---

[2]    The Court uses this terminology because the Proposed 3rd Amended Plan was never approved, although
it was the subject of a July 7, 2009 conciliation conference.  The Trustee's notes from that conference indicate that the
Debtors were going to propose a sale of real estate, but the Proposed 3rd Amended Plan has never been withdrawn, except
to the extent it was withdrawn, by implication, when a still-later proposed amendment to the Plan was filed.  *See*
discussion, *infra.*.

not part of either the confirmed Plan or the Proposed 3rd Amended Plan, on August 21, 2009, the Court approved the sale in an *Order Authorizing Public Auction Sale of Personal Property Free and Divested of Liens* ("*Sale Order*"). The *Sale Order* directed that all of the proceeds of the sale, net of expenses, be turned over to the Chapter 12 Trustee. As of that time, the Debtors, effectively, were out of the farming business.

The IRS was not given notice of the *Sale Motion*, the hearing on it, or the *Sale Order*.[3] The first notice to the IRS came on August 25, 2009, when the Debtors filed the *Tax Motion*. In it they stated that their accountant had advised them that whatever amount was received at the sale to be held pursuant to the *Sale Order* would be subject to capital gains tax. The *Tax Motion* further asserted Debtor's contention that, pursuant to *Section 1222(a)(2)(A)*, they had a right to treat such capital gain tax as an unsecured claim, not entitled to priority, because the sale involved assets involved in their farming operation.[4] Debtors asked for a declaratory judgment to that effect.

On September 7, 2009, prior to any response from the IRS or hearing on the *Tax Motion*, an auction was held pursuant to the *Sale Order*. Gross proceeds in the amount of $113,845 were realized from the sale with net proceeds of $96,255.63 remitted to the Chapter 12 Trustee. The Parties apparently agree that capital gains tax did become due as a result of the sale, although the

---

[3]      In fact, the IRS had not at this point been a party at any time in this Bankruptcy. The Debtors did not serve notice of any kind on the IRS until the filing of the *Tax Motion* at issue here.

[4]      Since unsecured creditors are not to receive any distribution under the Plan, this would result in no payment of any capital gain tax claimed by the IRS.

amount has not been determined.[5]  Calculation of the amount of tax is not relevant to the Court's decision here.

On September 24, 2009, the Debtors filed another sale motion, this one seeking authority to auction five of their six parcels of real estate, retaining only the lot which contains their primary residence.  The Debtors sought to delay the proposed sale of the real property when it became clear that the issue regarding the capital gains tax would be disputed.  That second sale motion was eventually denied on November 18, 2009.

On a parallel track, the IRS filed its response to the *Tax Motion* on September 30, 2009, disputing among other things, the Debtors' right to treat the capital gain tax as an unsecured claim.  The Debtors filed a brief in support of their position on October 7, 2009.  On that same date, a hearing on the *Tax Motion*  was held.  At the suggestion of the IRS, with agreement from the Debtors, the *Tax Motion* was "converted" into one  to determine priority of claim.[6]  The Parties further agreed that the matter involved strictly a legal issue.  As such, the Court directed that they submit a stipulation of facts, which was filed on November 6, 2009.  Also at the Court's direction, the Debtors and the IRS filed additional briefs.  On December 7, 2009, the Chapter 12 Trustee filed her brief supporting the Debtors' position.

After the Parties further supplemented the record, another argument on the *Tax Motion* was heard on April 19, 2010, at which time the IRS raised the issue of sovereign immunity

---

[5] *See Joint Statement of Issues and Supplement to Stipulation of Facts*, Document No. 247, filed on March 5, 2010.

[6] *Audio Transcript of 10/7/09 hearing,* 2:53:34 - 2:54:45.

for the first time.[7]  Based on that occurrence and an additional issue arising at this hearing as to

whether  the property sold and/or the proceeds from the sale  constituted property of the estate or

property of the Debtors, the Court ordered  further briefing. The final such brief was filed on June

18, 2010.  Shortly before that, on June 2, 2010, and somewhat inexplicably belated in the Court's

view, the Debtors filed yet another proposed, amended plan ("Proposed 4th Amended Plan") that

would finally provide for the farming asset sale, add the IRS as a creditor, and address the IRS tax

claim under *Section 1222(a)(2)(A)*.[8]

        While the Court was in the process of deciding this matter, the Court of Appeals for

the Ninth Circuit rendered a decision in *United States v. Hall*, 617 F.3d 1161 (9th Cir. 2010)[9] which

the Parties believed to involve much the same issue currently before this Court.   In sharp contrast

to  previously decided cases on the issue which had found in favor of the Debtors' position, such as

*Knudsen  v.  IRS*,  581  F.3d  696  (8th  Cir.  2009),  *Hall*  adopted  a  "plain  meaning"  approach  to

application of the statutory language and ruled in favor of the United States.  The Court found the

issuance of the *Hall* opinion significant enough to warrant comment by the Parties, so it afforded

them  an  opportunity  to  file  additional  briefs.   On  October  4,  2010,  the  Court  heard  yet  further

argument on the outstanding issues.  The matter is now ripe for disposition.

---

[7]        *Audio Transcript of 4/19/10 hearing*, 2:42:26 - 2:43:40.

[8]        Recognizing that a decision on the *Tax Motion* was required before the approval of the Proposed 4th
Amended Plan could even be considered, on November 12, 2010, the Court indefinitely continued consideration of it.

[9]        The Debtors in *Hall* have filed a petition for writ of certiorari in the Unites States Supreme Court. *See*
70 U.S.L.W. 3421 (No. 10-875, Dec. 30, 2010).  Were this Court assured that the writ would be granted in *Hall* it might
elect to wait for a decision from the Supreme Court in that case to provide further guidance.  However, since a grant of
*certiorari* is not assured and since the Court believes the factual circumstances in the present case involving a
postconfirmation tax are materially different from *Hall* in any event, the Court will not delay its decision further merely
to see if *certiorari* is granted. *See, e.g., Krenger v. Pennsylvania R. Co.,* 174 F.2d 556 (2d Cir. 1949)  (decision in case
rendered even though there was a pending writ of *certiorari* to the Supreme Court in another case involving the same
issue).

6

## SOVEREIGN IMMUNITY

Before it can even consider the substantive issues raised by the *Tax Motion*, the Court must first address the assertion by the IRS that the doctrine of sovereign immunity prevents the Court from ruling on the matter. As indicated above, the sovereign immunity issue was a relatively late entrant into the case, having been first raised by the IRS at the second oral argument held on April 19, 2010. Nevertheless, a defense of sovereign immunity implicates the Court's subject matter jurisdiction, and as such, may be raised at any time. *See, e.g., In re Hechinger Inv. Co. of Delaware, Inc.* 399 F.3d 243 (3d Cir. 2003). The Court would naturally prefer that a question of sovereign immunity be raised "front and center" at the first opportunity so as to avoid wasted effort, but even in the absence of that happening, the matter must be faced and resolved before the outstanding substantive issues can be addressed.

The IRS' position on sovereign immunity is simple and direct. It notes that waivers of sovereign immunity must be clear and explicit and points to the undisputed fact that *Section 1222*, the provision upon which the Debtors rely here, is not among the "laundry list" of *Bankruptcy Code* sections for which sovereign immunity has been "abrogated" as expressly set forth in *Section 106(a)(1)*. After careful consideration the Court must reject the argument of the IRS in this regard.

Regardless of the specific form of the *Tax Motion*, at bottom what the Debtors are seeking is a determination that the capital gains tax liability owed to the IRS can be treated as an unsecured claim and thereby be discharged in the bankruptcy. In *Tennessee Student Assistance Corp. v. Hood*, 541 U.S. 440 (2004) the Supreme Court held that a Debtor's effort to discharge a student loan debt on grounds of undue hardship did not infringe on the sovereignty of the state that

7

had guaranteed the debt.  Rather, it held that the discharge of a debt by a bankruptcy court is an *in rem* proceeding, with the  Court's jurisdiction premised on the debtor and his estate, not on creditors.  541 U.S. at 447.  As the  Supreme Court explained:

> No matter how difficult Congress has decided to make the discharge of student loan debt, the bankruptcy court's jurisdiction is premised on the res, not on the persona; that States were granted the presumptive benefit of nondischargeability does not alter the court's underlying authority.  A debtor does not seek any monetary damages or affirmative relief from a state by seeking to discharge a debt; nor does he subject an unwilling state to a coercive judicial process.  He seeks only a discharge of the debts.

541 U.S. at 450.  The Supreme Court concluded by finding that nothing in a bankruptcy court's exercise of its *in rem* jurisdiction to discharge a student loan debt would infringe upon state sovereignty.  *Id.*

Although the *Tennessee Student* case involved a state, and not the federal government, it aptly describes the situation in the present case.  The Debtors are not seeking monetary relief or any other sort of affirmative relief from the IRS; they are seeking to discharge a tax obligation by having it treated as unsecured debt.  There is no reason why the result should be any different here because it is federal sovereign immunity at issue.  *See In re Knudsen*, 581 F.3d 696, 720 (Colloton J., concurring in the judgment and dissenting in part) (although *Tennessee Student* involved state sovereign immunity under the Eleventh Amendment, the Supreme Court's treatment of *in rem* jurisdiction and sovereign immunity suggests no different result with respect to the interests of the United States in a bankruptcy proceeding, citing cases).  Thus, the Court concludes that the sovereignty of the United States is not implicated in this proceeding, hence no waiver of sovereign immunity is required to be shown for the matter to proceed.

8

Going one step further, even if sovereign immunity were found to be "in play", the Court would find that the United States has waived its sovereign immunity.  In that regard, the Court finds persuasive the analysis provided in the majority opinion in *Knudsen*.  *See* 581 F.3d at 706-708.  As the court noted there, while *Section 1222* does not appear in the *Section 106(a)* list, the language of *Section 1222(a)(2)(A)* specifically exempts from priority a claim owed to a "governmental unit," a term defined by the Code to include the United States.  *See Section 101(27)*. Given this "straightforward and specific" language of the statute, this Court agrees with *Knudsen* that sovereign immunity has been waived.  *See also, United States v. Nordic Village, Inc*., 503 U.S. 30, 40-41 (1992) (Stevens J., dissenting) (under the *Bankruptcy Code*, the United States is a "government unit," therefore any provision of the *Code* that contains the term applies to the United States notwithstanding any assertion of sovereign immunity).  Finally, *Knudsen* also notes that *Section 503,* which is intimately involved in the *Section 1222(a)(2)(A)* determination through the intermediary of *Section 507*, actually *is* referenced on the *Section 106(a)* list of provisions for which sovereign immunity has been statutorily waived.[10]

### POSTPETITION TAX TREATMENT UNDER SECTION 1222(a)(2)(A)

Having concluded that sovereign immunity is not a bar to proceeding further, the

---

[10]    For a more detailed discussion of how *Section 503* is inextricably linked with *Section 1222(a)(2)(A)*, via *Section 507*, see p. 11, *infra*.  If sovereign immunity were not waived by the express inclusion of *Section 507* considerations into *Section 1222(a)(2)*, which then expressly injects *Section 503* considerations into it, *Section 1222(a)(2)* could be rendered meaningless – which is a result to be avoided.  *See, e.g., TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (it is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant).

9

Court may now turn to the actual substance of the matter.[11]    The issue as articulated by the Debtors

is whether *Section 1222(a)(2)(A)* allows them to treat their capital gains tax obligation as an

unsecured claim under the particular facts of the case. *Section 1222(a)(2)* states in relevant part, that

a Chapter 12 plan shall:

> ... provide for the full payment, in deferred cash payments, of all claims
> entitled to priority under section 507, unless —
>
> (A) the claim is a claim owed to a governmental unit that arises as a result
> of the sale, transfer, exchange, or other disposition of any farm asset used
> in the debtor's farming operation, in which case the claim shall be treated
> as an unsecured claim that is not entitled to priority under section 507, but
> the debt shall be treated in such manner only if the debtor receives a
> discharge ....

*11 U.S.C. §1222(a)(2)*(A).

The IRS agrees that the assets and livestock sold at the auction were "farm asset[s]

used in the debtor's farming operation" and the question of discharge is not yet ripe.  Therefore, at

the end of the day, the question at issue is whether the capital gain taxes that became due as a result

of the September sale are "entitled to priority under Section 507."

This seemingly simple question turns out to be of surprising complexity, involving

the interrelationship among several *Bankruptcy Code* provisions, as well as the *Internal Revenue*

*Code*  ("IRC").  Rather than try to explain this interrelationship in narrative form, it will perhaps be

easier to do so in "bullet point" format:

---

[11]    This is a core proceeding under *28 U.S.C. §157(b)(2)(I)* and *(O)*.  The Court has jurisdiction to decide
the matter pursuant to *28 U.S.C. §§157* and *1334*.

- *Section 1222(a)(2)(A)* applies only to "claims entitled to priority under section 507."

- *Section 507*, in turn, lists two categories of taxes entitled to receive "special treatment" in bankruptcy, *11 U.S.C. §§507(a)(8), 507(a)(2).*

- *Section 507(a)(8)* includes various taxes incurred "on or before the date of the filing of the petition."  Since the taxes at issue here were incurred after the filing of the petition this provision is not applicable.

- *Section 507(a)(2)* consists of "administrative expenses allowed under section 503(b)."  *11 U.S.C. §507(a)(2).  Section 503(b)* allows for "administrative expenses .... including .... any tax ... incurred by the estate."  *11 U.S.C. §503(b)(1)(B)(i).*

- The *Internal Revenue Code* provides that a separate taxable entity is not created as the result of a filing of a petition under Chapter 12. *26 U.S.C. §§1398, 1399.*

The last point in the above list distinguishes cases in Chapter 12 (and Chapter 13) from individual Chapter 7 and Chapter 11 cases where the *IRC does* provide for the creation of a separate taxable entity upon the filing of a petition.  Since a Chapter 12 bankruptcy estate is not treated as a  separate taxable entity, that naturally leads to the question of whether  the phrase "tax ... incurred by the estate" has any relevance in the case of a postpetition capital gains tax.

The IRS, adopting a "literal" approach to the meaning of "incurred by the estate," argues that the estate cannot incur taxes, postpetition, because a bankruptcy estate in Chapter 12 is not a taxable entity.  According to the IRS argument, it therefore follows that the requirement of

*Section 503(b)(1)(B)(i)*[12] is not met and the Debtors cannot obtain *Section 1222(a)(2)(A)* treatment for the capital gain tax.

On the other hand, the Debtors and the Chapter 12 Trustee assert a "temporal" view, under which they claim the phrase "incurred by the estate" should be construed to refer to any tax that is incurred postpetition, regardless of which entity – Debtors or the estate – actually incurs the tax and regardless of the actual locus of the ownership of the farm assets at the time of sale.  The Debtors further contend that the statute is ambiguous and therefore it is appropriate to resort to the legislative history which they claim supports their view.

The application of *Section 1222(a)(2)(A)* to postpetition tax claims is an issue of first impression in the Third Circuit.  In *West Virginia State Dep't of Tax & Revenue v. IRS (In re Columbia Gas Transmission Corp.)*, 37 F.3d 982, 984 (3d. Cir. 1994) the court did hold that the priority for tax "incurred by the estate," as described in *Section 503(b)(1)(B)(i)*, extends only to taxes incurred *after* the bankruptcy petition has been filed.  That does not seem to advance matters much here because all Parties concede that the tax at issue was incurred after the petition was filed.

As previously indicated, the meaning of *Section 1222(a)(2)(A)* in the context of postpetition capital gains tax has been the subject of two other Circuit Court decisions, *Hall* and

---

[12]

    (b) After notice and hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including –
    (1) ...
        (B) any tax –
        (i) incurred by the estate, whether secured or unsecured, including property taxes for which liability is in rem, in personam, or both, except a tax of a kind specified in section 507(a)(8) of this title; or ....

*Knudsen*, which reached opposing conclusions.  In *Knudsen*, the earlier of the two cases, the Eighth

Circuit  rejected an argument by the IRS which was essentially the same argument as the IRS is

making in the present case.  *Knudsen* found that "incurred by the estate" simply meant "incurred

postpetition."  581 F.3d at 708.  In support of its conclusion, the court found that the language of

*Section 1222(a)(2)(A)* does not restrict its application to prepetition sales and that

> "it is the IRC, *not the Bankruptcy Code*, that creates a 'separate taxable
> entity' upon the filing of petitions by individuals under Chapters 7 and 11
> but does not create a separate taxable entity in cases filed by individuals
> under Chapters 12 and 13."

*Id.* at 709 (emphasis in original).  While not explicitly saying so, the *Knudsen* court therefore seemed

to suggest that the IRC provision which did not create a separate taxable entity in Chapter 12 cases

was somehow trumped by *Section 1222(a)(2)(A)* or at least could be disregarded when applying

*Section 1222(a)(2)(A)*.

In further support of its conclusion that the taxes arising from a postpetition sale of

farm assets were incurred by the estate for purposes of *Section 1222(a)(2)(A)*,  the *Knudsen* court

looked to the definition of "property of the estate" found in *Section 1207* which provides:

> § 1207.  Property of the estate
>
> (a)  Property of the estate includes, in addition to the property specified in
> section 541 of this title-
>
>> (1) all property of the kind specified in such section that the debtor
>> acquires after the commencement of the case but before the case is
>> closed, dismissed, or converted to a case under chapter 7 of this
>> title, whichever occurs first; and
>>
>> (2) earnings from services performed by the debtor after the
>> commencement of the case but before the case is closed, dismissed,
>> or converted to a case under chapter 7 of this title, whichever
>> occurs first.

13

*11 U.S.C. §1207*.  The *Knudsen* court determined that even though there is no "separate taxable

entity" in a Chapter 12 case, under *Section 1207(a)*, an "estate" still exists and that the postpetition

sale of farm assets fell within the ambit of that Section.  *Knudsen* at 709-10.   For other cases

reaching the  same result as *Knudsen*,  *see In re Ficken*, 430 B.R. 663 (10th Cir. BAP 2010) *appeal*

*docketed*, No. 10-1276 (10th Cir. July 2, 2010); *In re Dawes*, 382 B.R. 509, 519 (Bankr. D. Kan.

2008), *aff'd*. 415 B.R. 815 (D. Kan. 2009), *appeal docketed*, No. 09-3129 (10th Cir. May 7, 2009)*;*

*In re Gartner*, 2008 WL 5401665 (Bankr. D. Neb. 2008)*.*

In *Hall*, the  Ninth Circuit reached a contrary result and found in favor of the IRS'

position based on a "plain meaning approach" to *Section 1222(a)(2)(A)* ascertaining no ambiguity

in the statutory language.  *Hall* held that the tax on the gain arising from a postpetition sale of farm

assets in a Chapter 12 case does not qualify as an administrative expense under *Section*

*503(b)(1)(B)(i)* because it is not a tax "incurred by the estate" and therefore the taxes are not claims

entitled to priority under *Section 507*, which finding is required in order to fit within the provisions

of *Section 1222(a)(2)(A)*.  617 F.3d. at 1163.  The Court determined that it must look to the *United*

*States Code* as a whole,  specifically including *Sections 1398* and *1399* of the *IRC* which provide

that no separate taxable entity arises merely from the commencement of a case under Chapter 12 of

the *Bankruptcy Code:*

> It follows that a Chapter 12 estate is not a taxable entity....  Since the
> Chapter 12 estate is not a taxable entity, the Chapter 12 estate cannot 'incur'
> a tax.  Because it cannot 'incur' a tax.... it cannot get the benefit of *Section*
> *1222(a)(2)(A)* which provides that the tax on the gain from the sale of a
> farm during bankruptcy is dischargeable and payable in less than full.

*Id*. at 1163-64.

14

Just as here, the debtors in *Hall* asserted that "incurred by the estate" in *Section 503(b)* means "incurred postpetition," rendering it of no moment whether the estate can incur a tax because, the argument goes, the key consideration is *when* the tax was incurred.  But, the *Hall* court made a critical distinction that this Court believes is applicable here:

> It is true that the cases the Halls and *Knudsen* cite state that all taxes "incurred by the estate" are "incurred postpetition."  They must:  because an estate does not exist until after a bankruptcy petition is filed, any taxes an estate incurs are necessarily incurred postpetition.  But just because all apples are fruits does not mean that all fruits are apples.  Likewise, although all taxes "incurred by the estate" are "incurred postpetition," not all taxes incurred postpetition are "incurred by the estate."

*Hall,* 617 F.3d at 1165.

The debtors in *Hall* next argued "that the fact that a bankruptcy estate exists and can hold property means that it can incur taxes."  The *Hall* court disagreed, finding that there was nothing in Chapter 12 of the *Bankruptcy Code* providing a bankruptcy estate with the inherent ability to incur taxes.  *Id*.  In contrast to the *Knudsen* case, which referenced *Section 1207* to indirectly support its view, *Hall* found that *Section 1207*:

> ... merely includes as property of the estate whatever the debtor acquires postpetition.  It does not contain the slightest suggestion that the ability to retain property implies the ability to incur taxes.

*Id* at 1166.

*Hall* also addressed the issue of congressional intent:

> It may well be that the drafter's intention for § 1222(a)(2)(A) differs from its text ....  But it is our duty to follow the text because the text is the law.  Congress is entirely free to change the law by amending the text.

15

*Hall*, 617 F.3d at 1167 (citations omitted).  For a case reaching a similar conclusion as *Hall* under

Chapter 13, *see In re Whall*, 391 B.R. 1 (Bankr. D. Mass. 2008) (noting that "incurred by the estate"

contains no temporal adjectives and finding that it strains credibility to assume Congress would have

used the language in question if it simply meant "incurred during the estate" or "incurred

postpetition").

After having considered both *Knudsen* and *Hall*, the Court is not convinced either

one is entirely in harmony with the applicable law on statutory interpretation.  The Court of Appeals

for the Third Circuit has instructed that, so long as the statutory language is not ambiguous, courts

are to follow and  not look beyond the statutory language except in the rare, exceptional

circumstance where application of a statute's plain meaning may "produce a result demonstrably at

odds with the intention of its drafters... or an outcome so bizarre that Congress could not have

intended it."  *In re Visteon Corp.,* 612 F.3d 210, 226 (3d Cir. 2010).  Recently, in the case of *In re*

*Philadelphia Newspapers, LLC*, 599 F.3d 298, 304 (3d Cir. 2010), the  Third Circuit again set forth

its position on the "plain meaning" rule:

> It is the cardinal cannon of statutory interpretation that a court must begin
> with the statutory language.  "[C]ourts must presume that a legislature says
> in a statute what it means and means in a statute what it says there.  When
> the words of a statute are unambiguous, then this first cannon is also the
> last: judicial inquiry is complete." ...  Where the statutory language is
> unambiguous, the court should not consider statutory purpose or legislative
> history ....
>
> In determining whether language is unambiguous, we "read the statute in
> its ordinary and natural sense." ...  A provision is ambiguous only where the
> disputed language is "reasonably susceptible of different interpretations."
> ...

*Id.*  (citations omitted).

16

While the *Hall* court overtly based its decision on the plain meaning rule, the Court questions whether *Knudsen* and the other cases relied upon by the Debtors here gave sufficient heed to that rule as the Third Circuit would require. For instance, in *Knudsen*, the court simply announced that "[w]e have previously recognized that 'incurred by the estate' means 'incurred postpetition'," without explaining how that result comports with the plain meaning rule. 581 F.3d at 700. In this Court's view, *Knudsen's* interpretation of "incurred by the estate" to mean "incurred postpetition" is difficult to square upon application of the rule. The *Knudsen* court did later in the opinion engage in a rigorous application of what it termed the "plain language" rule, but only with respect to the meaning of the phrase "any farm asset used in the debtor's farming operation" – something not at issue in the present case. 581 F.3d at 710 *et. seq.* The courts in *Ficken* and *Dawes* likewise failed to engage in a meaningful application of the plain meaning rule, instead relying primarily on the holdings in other cases. *See, e.g., In re Visteon Corp.*, *Id.* (noting that when applying the plain meaning rule it is error to begin with case law or underlying assumptions of what an appropriate result would be rather than considering the statutory language "first and foremost.")

Also of concern to this Court is the *Knudsen* court's willingness to disregard the key fact that there is no separate taxable entity created in a Chapter 12 filing merely because such is provided for in the *IRC*, rather than the *Bankruptcy Code*. This Court agrees with *Hall* – that *U.S. Code* should be construed and harmonized as a whole where possible. This view finds support in the *Bankruptcy Code* itself, where *Section 346(a)* provides in relevant part:

> Whenever the Internal Revenue Code of 1986 provides that a separate taxable estate or entity is created in a case concerning a debtor under this title, and the income, gain, loss, deductions, and credits of such estate shall be taxes to or claimed by the estate, a separate taxable entity is also created for purposes of any state and local law imposting a tax on or measured by

17

> income and such income, gain, loss, deductions, and credits shall be taxed
> to or claimed by the estate and may not be taxes to or claimed by the debtor.

*11 U.S.C. §346(a)*.  This demonstrates a clear recognition by Congress of the interrelationship between the *IRC* and the *Bankruptcy Code* and in fact an acknowledgment that, to a certain extent, provisions of the *IRC* will "control" proceedings in bankruptcy.  This Court finds that the harmonization approach followed by *Hall* in this regard is the proper one.

On the other hand, the *Hall* decision is not without difficulties of its own.  Although application of the plain meaning rule should be the norm, there is a recognition that a plain meaning may be disregarded in the "rare, exceptional" circumstance where application of the plain meaning would lead to a result demonstrably at odds with the intentions of the law's drafters, or an outcome so bizarre that Congress could not have intended it.  Does section 1222(a)(2)(A) represent such a rare, exceptional circumstance?  If application of the plain meaning of the phrase "incurred by the estate" means that no postpetition capital gain tax may ever receive special treatment under *Section 1222(a)(2)(A)*, does that leave the provision meaningless and superfluous, a result so bizarre that Congress could not have intended it, or does the provision still have some practical application?  Those are significant questions which *Hall* does not seem to have fully considered.

As should be apparent from the above discussion, the Court is not entirely "sold" on either the *Knudsen* or *Hall* approaches to this issue, though if pressed it would tend to side with *Hall* based on the record before it.  However, the Court finds that the present case is distinguishable in a fundamental way from *Knudsen*, *Hall*, and all the other cases cited by the Parties in that the sale of the Debtors farm assets in this case was done *postconfirmation* and not pursuant to the terms of

the confirmed Plan.  The Court can thus decide the case on that basis, without needing to make a definitive ruling on the broader issue of whether *Section 1222(a)(2)(A)* applies to postpetition capital gains tax generally.

## *POSTCONFIRMATION CAPITAL GAINS TAXES*

The IRS correctly points out  that the present case involves a plan that had already been confirmed at the time of the sale of the Debtor's property, rendering the capital gains tax from that transaction as a "postconfirmation" debt.  The IRS argues that this key fact distinguishes this case from all of the other cases cited by the Debtors in which courts have allowed taxes arising from postpetition (but not postconfirmation) sales to be treated as unsecured claims.

The IRS contends that confirmation marks a critical point, citing to *Holywell Corp. v. Smith*, 503 U.S. 47 (1992) to support its view.  In *Holywell* a Chapter 11 trustee was appointed pursuant to a confirmed plan to liquidate the debtor's property after it had been transferred to a trust created by the plan.  The trustee sought declaratory judgment to the effect that he had no  obligation to file returns and pay taxes upon gains realized from the sale of the property.  The plan was silent on these points.  The United States had not previously objected to its confirmation.  Of particular interest here is part "II(C)" of the opinion, where the Supreme Court addressed the trustee's argument that he was not required to pay the taxes because there was no requirement to do so under the confirmed plan.

19

The trustee argued that under *Section 1141(a)* the United States was a creditor, bound by the plan and it should have objected to the plan if it had wanted to effect a different result.[13]  503 U.S. at 58.  A unanimous Supreme Court rejected the trustee's argument, stating:

> The United States is not seeking from the trustee any taxes that came due prior to his appointment...Even if §1141(a) binds creditors of the corporate and individual debtors with respect to claims that arose before confirmation, we do not see how it can bind the United States or any other creditor with respect to postconfirmation claims.

*Id.  See also, U.S. Trustee v. Gryphon Stone Mansion, Inc*., 166 F.3d 552 (3d Cir. 1999) (relying on *Holywell* and holding that a trustee's claim for postconfirmation fees did not exist until after the plan was confirmed, so the plan could not discharge the debtor's obligation to pay such fees).

Just as in *Holywell*, the taxes at issue in the present case all came due postconfirmation.  Furthermore, even though *Holywell* was decided under Chapter 11 of the *Code*, there is a provision strongly analogous to *Section 1141(a)* in Chapter 12.  *See Section 1227(a)*.  If anything, the position of the IRS is even stronger in this case than it was in *Holywell* because here it did not have any notice of the Plan and related confirmation proceedings and therefore could not have objected to confirmation. The Court is thus left to question how the Debtors can possibly avoid their tax obligation to the IRS when it arose postconfirmation and is not addressed in the confirmed Plan.

---

[13]      *Section 1141(a)* provides in relevant part that "the provisions of a confirmed plan bind the debtor...and any creditor...whether or not the claim or interest of such creditor...is impaired under the plan and whether or not such creditor...has accepted the plan."  *See also*, *United States Student Aid Funds, Inc. v. Espinosa*, ___ U.S. ___, 130 S.Ct. 1367, 1380 (2010) (discussing binding nature of a confirmed plan).

The Debtors apparently hope to do so by the expedient of amending their plan *ex post facto* pursuant to *Section 1229(a)* by way of the Proposed 4th Amended Plan and inclusion of provisions for *Section 1222(a)(2)(A)* treatment of the capital gains tax issue.[14]  Postconfirmation modification of Chapter 12 plans is not, however, a limitless free-for-all.  *Matter of Witkowski*, 16 F.3d 739, 745 (7th Cir. 1994) (construing the analogous Chapter 13 provision at *Section 1329(a)*).  *Section 1229(a)* provides that a Chapter 12 plan may be modified after confirmation only to:

(1)    increase or reduce the amount of the payments on claims of a particular class provided for by the plan;
(2)    extend or reduce the time for such payments;
(3)    alter the amount of the distribution to a creditor whose claim is provided for by the plan to the extent necessary to take account of any payment of such claim other than under the plan.

11 U.S.C. §1229(a).  *Section 1229(a)* was not designed to furnish a vehicle by which debtors may effectuate   wholesale, after-the-fact changes in their plans.  *In re Johnson*, 1995 WL 1943424 (Bankr. D. N.D. 1995).

Upon a plain reading of the statute, the modification to the Plan which the Debtors seek to make in this case does not fit within any of the permitted reasons for postconfirmation modification. They are not seeking to increase or decrease the amount of payments to a particular class and are not seeking to extend or reduce the time for payments.  As such, *1229(a)(1)* and *(2)* are eliminated as possible grounds for relief.  Since the IRS  is not even identified as a creditor in the Plan, *1229(a)(3)* is also inapplicable.

---

[14]    The Debtors have not pointed to any case law in which a postconfirmation plan modification has been used to authorize *Section 1222(a)(2)(A)* treatment for a sale not contemplated  in the plan as originally confirmed.  The Debtors appear to suggest that *In re Gartner*, 2008 WL 5401665 (Bankr. D. Neb. 2008) is one such case.  However, a close reading of that case indicates that there was no prior confirmed plan and the IRS only agreed to the plan at issue on the condition that the *Section 1222(a)(2)A)* issue be "carved out" to allow it to be litigated later.

What the Debtors are in effect seeking to do is to modify the plan by adding the IRS as a new creditor. Although the Court has not been able to find any cases on point under *Section 1229(a)*, the majority of cases construing the counterpart provision, *Section 1329(a)* in Chapter 13, have concluded that a postconfirmation plan modification cannot be used to add a new creditor that was not part of the confirmed plan. *In re Smith*, 388 B.R. 603 (Bankr. E.D. Pa. 2008) (not permitting proposed postconfirmation modification to add new secured creditor); *In re Plummer*, 378 B.R. 569 (Bankr. C.D. Ill. 2007) (*Bankruptcy Code* does not permit postconfirmation amendments to Chapter 13 plans to add omitted creditors); *In re Moore*, 247 B.R. 677 (Bankr. W.D. Mich. 2000) (provisions in *Section 1329(a)* are exclusive, not merely illustrative, and do not permit a plan to be modified to include additional creditors). Under the circumstances of this case, the Court believes the foregoing cases appropriately govern the modification attempt by the Debtors here. *But, c.f., In re Rodriguez*, 225 B.R. 628 (Bankr. S.D. Tex. 1998) (stating that *Section 1329(a)* does not explicitly allow the addition of a creditor but nevertheless construing the statute to implicitly authorize such addition because by allowing a modification to increase payments to a class, the statute, arguably, implies that additional creditors might be added to a class).

It is also clear that postconfirmation plan modification is not strictly a matter of right. A bankruptcy court that is asked to approve a modification may exercise discretion in deciding whether to grant such approval. *See, e.g., Plummer*, 378 B.R. at 574-575, *In re Tozer*, 392 B.R. 758, 760 (Bankr. W.D. Wis. 2008), *In re Storey*, 392 B.R. 266, 268 (6th Cir. BAP 2008), *In re Watson*, 417 B.R. 165, 170 (Bankr. D. N.H. 2009). In passing on a proposed modification, the court may consider whether the modification has been proposed in "good faith." *Section 1229(b)(1)* (postconfirmation modification subject to good faith requirement of *Section 1225(a)(3)*). In this

22

context, good faith requires the absence of any abuse of the purpose and intent of the *Bankruptcy Code*. *See, In re Mellors*, 372 B.R. 763, 772 (Bankr. W.D. Pa. 2007). Looked at another way, seeking to extract too many benefits from the Chapter 12 process, at a creditor's expense, may constitute an absence of good faith. *Id*.

The Court has substantial doubts as to whether Debtors' proposed modification as set forth in the Proposed 4th Amended Plan would sufficiently satisfy the good faith requirement so as to allow the Court to approve it.[15] Whatever conclusion one may distill from questioning the reach of *Section 1222(a)(2)(A)* that was answered by the courts in *Knudsen* and *Hall*, it is abundantly clear that the overriding purpose of even including the provision in Chapter 12 was to further the Chapter 12 goal of making it easier for farmers to reorganize so they could continue their farming operations. *See, e.g., In re Dawes*, 382 B.R. 509, 519 (Bankr. D. Kan. 2008), *aff'd*. 415 B.R. 815 (D. Kan. 2009), *appeal docketed*, No. 09-3129 (10th Cir. May 7, 2009) (entire purpose of Chapter 12 is to allow a farmer to reorganize and specific purpose of the amendment to *Section 1222* was to remove a major impediment to reorganization). *See also,* Katherine M. Porter, *Phantom Farmers: Chapter 12 of the Bankruptcy Code*, 79 Am. Bankr. L. Jnl. 729, 737-38 (Summer 2005) (noting that to the extent *Section 1222(a)(2)(A)* could be used to help farmers to substantially reduce the size or scope of their farming operations it would be at odds with the "stated purpose" of Chapter 12 to encourage family farming). Here, the Debtors ceased their farming operations as a result of the sale in question – there were no further farming operations thereafter. Avoidance of their tax

---

[15] The Court recognizes that Parties may "push the envelope" to get the maximum benefit from a bankruptcy and there is nothing *per se* improper with that. When a Party pushes beyond what the law will bear, such that granting the relief requested would provide more benefit then the law properly understood allows, it is fair to characterize the action as an overreach. That is the sense the Court intends to be understood in its question as to "good faith," not a sense of deception or underhandedness.

23

obligation would not further the purpose of *Section 1222(a)(2)(A)*, and, as previously suggested, the Court must even question whether the Debtors are seeking to extract too many benefits from the Chapter 12 process. *See, e.g., In re Lockard*, 234 B.R. 484, 491 (Bankr. W.D. Mo. 1999) (court agreed that it would not serve the purposes of Chapter 12 and would probably be inappropriate to confirm a plan if the debtor has completely ceased farming operations).

Another factor which the Court cannot ignore is the timing of the Proposed 4ᵗʰ Amended Plan. While the *Tax Motion* was filed on August 25, 2009 and sale of farm assets occurred on September 7, 2009, the Proposed 4ᵗʰ Amended Plan was not filed until June 2, 2010. The Debtors knew by no later than September 30, 2009, that the IRS opposed the *Tax Motion*, yet for some reason they waited for more than eight (8) months thereafter before taking any step to amend the Plan. The Court views this as akin to laches, adding yet another reason to question whether a good faith standard has been met here.

The Court thus finds that the modification to the Plan proposed by the Debtors, which would add the IRS as a creditor and address its claim there for the first time, is not permitted by *Section 1229(a)* and is of questionable good faith in any event. This leaves the Debtors "stuck" with the current Plan, and thus unable to bind the IRS with respect to the attempted treatment of postconfirmation capital tax claims as normal unsecured debt.

The postconfirmation status of this matter has one further consequence that distinguishes it from *Knudsen* and is a further detriment to the Debtors' position. As noted above, one of the other *Bankruptcy Code* provisions upon which the *Knudsen* court relied was *Section 1207(a)* which essentially provides that "property of the estate" includes, in addition to the property

24

specified in *Section 541*, all similar property that the debtor acquires after the commencement of the case but before closure, dismissal or conversion, and earnings from services performed by the debtor after the commencement of the case but before closure, dismissal or conversion. *See* 581 F.3d at 709-10. The *Knudsen* court found it significant that, even though the estate was not a taxable entity under the IRC, the assets which had been sold postpetition to generate the taxes at issue were nevertheless "property of the estate" within the *Section 1207(a)* definition.

The fact that the sale of farm assets by the Debtors in the present case occurred not just postpetition, but also postconfirmation, implicates another *Bankruptcy Code* provision that *Knudsen* did not need to address, *viz,. Section 1227(b)*, which provides:

> (b)    Except as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all property of the estate in the debtor.

*11 U.S.C. §1227(b)*. Neither the Plan nor the Confirmation Order in the present case provide "otherwise."[16] In fact, the Plan (as well as the proposed 3rd Amended Plan and the Proposed 4th Amended Plan) expressly provides that "[t]he title to the debtors' property shall remain with the debtors." See Document No. 127 at ¶9(e). This was consistent with the provision that funding for the plan was to come from the Debtors' future farming operations, not the sale of farm assets. Therefore, a plain reading of *Section 1227(b)* indicates that when the farm assets were sold they were not property of the estate.

---

[16]    Chapter 13 contains a section that is analogous to *Section 1227(b)*. *See Section 1327(b)*. Acting on the authority provided by *Section 1327(b)*, the standard plan form promulgated by the Court for use in Chapter 13 cases in this District includes a provision specifying that property of the estate *does not* revest in the debtor until the bankruptcy case is closed. *See Local Form #10* at page 5. *See In re Weisel*, 400 B.R. 457, 470-71 (Bankr. W.D. Pa. 2009), affirmed 428 B.R. 185 (W.D. Pa. 2010). There is no such corresponding "form" plan for use in Chapter 12 cases.

If the farm assets in the present case were not even property of the estate at the time they were sold, that would put the taxable transaction at yet a further remove from the bankruptcy estate, making it even more difficult to conceptualize how *Section 1222(a)(2)(A)* could apply here. Perhaps recognizing this, the Chapter 12 Trustee argues vigorously that, even though the sold farm assets themselves may not have been property of the estate at the time they were sold, the proceeds from the sale upon receipt are "re-vested" into property of the estate.

In the abstract, the topic of what happens to a Chapter 12 bankruptcy estate[17] upon confirmation of a plan is one that has bedeviled the courts. The confusion arises from the apparent conflicting pronouncements of *Section 1207(a)* and its analogues (indicating the estate can acquire property after confirmation) and *Section 1227(b)* and its analogues (indicating that all property of the estate is vested in the debtor upon confirmation unless otherwise provided). Attempts at reconciling these paired provisions have resulted in a number of views. *See, e.g., In re Holden*, 237 B.R. 156,161 (Bankr. D. Vt. 1999) (noting 4 different lines of cases on the issue); *Weisel, supra*, 400 B.R. at 469-71 (stating that courts have taken 3 basic approaches); David Gray Carlson, *The Chapter 13 Estate and its Discontents*, 17 Amer.Bankr.L.Jnl. 233 (Winter 2009) (discussing various approaches courts have taken).

In the present case the Court finds that it does not need to wade into this controversy because, whatever overall theory is chosen, the statutory language makes clear that under the facts

---

[17]    The same issue arises with respect to Chapter 13 and individual Chapter 11 cases because they too are governed by provisions that are cognates to *Sections 1207(a)* and *1227(b)*. Compare those with *Sections 1306(a)* and *1327(b)*, and *Sections 1115(a)* and *1141(b)*. Given the very close similarity in language , relevant decisions from cases in these other Chapters are instructive as to the issue in Chapter 12.

26

presented here the proceeds from the sale of the farm assets remain with the Debtors and are not property of the estate.[18]  A brief consideration of *Section 1207(a)* explains why.  First, the proceeds clearly cannot qualify as "earnings from services," so they cannot come into the estate via *Section 1207(a)(2)*.  Second, while *Section 1207(a)(1)* does speak of property of the estate as including "all property of the kind specified in [*Section 541*] that the debtor acquires after the commencement of the case", the proceeds from the sale of the farm assets do not fall within that description.  This follows from *Section 541(a)(6)*, which provides that the estate is comprised of "[p]roceeds, product, offspring, rents, or profits of or from property of the estate."  This is the only relevant provision of *Section 541* dealing with 'proceeds,"[19] and as can be seen, it is explicitly limited to the proceeds of or from that which is property of the estate.  Both the Debtors and the Chapter 12 Trustee appear to concede, and the Court would so find in any event, that the farm assets were *not* property of the estate at the time they were sold, hence there is no mechanism under *Section 541* for the proceeds of such sale to become property of the estate.[20]  As indicated previously, this just further confirms the conclusion previously reached that *Section 1222(a)(2)(A)* is not available to the Debtors to obtain unsecured claim status for the capital gain tax at issue here.

---

[18]    The issue of whether the sale proceeds should be distributed to creditors, returned to the Debtors, or distributed to creditors after the payment of the Debtors' capital gains tax obligation arising from the sale is not before the Court, and the Court makes no ruling or comment at this time regarding that question.

[19]    *Section 541(b)(9)* addresses proceeds from the sale of money orders, and clearly has no application here.

[20]    On this issue even the Debtors agree, contrary to the Chapter 12 Trustee's assertions, that the proceeds from the sale of the farm assets are not property of the estate.  *See Debtors' Brief in Support of Motion for Determination of Tax Liability*, Document No. 235 at 2.

Document      Page 28 of 28

## *CONCLUSION*

For the reasons stated herein, the Debtor's *Tax Motion* which requests this Court to issue an order determining that any capital gains tax arising from the sale of the Debtors' cattle and equipment, and later sale of any real estate and other property, previously used in the Debtors' farming operation "shall not be entitled to administrative or priority status but shall be treated as an unsecured claim if the debtors receive a discharge in this case," will be denied.

An appropriate Order will follow.

Dated:  March 10, 2011

Thomas P. Agresti, Chief Judge
United States Bankruptcy Court

Case Administrator to serve:
    Debtors
    Gary V. Skiba, Esq.
    Ari D. Kunofsky, Esq.
    Ronda J. Winnecour, Esq., Trustee